Fabricant, J.
INTRODUCTION
This action arises from the decision of the Building Inspector of Newton to deny the plaintiffs application for a building permit for proposed renovations to an apartment building known as 280-82 Grove Street. Newton denied the application because the proposed renovation does not include installation of automatic sprinklers and upgrading of the fire alarm system to a “type I” system under the current building code. After a complicated and protracted series of proceedings before various administrative entities and this Court, the parties have, by agreement, presented the dispute in the form of an action for relief in two forms: review in the nature of certiorari of the decision of the Newton Fire Department requiring installation of automatic sprinklers, and review pursuant to G.L.c. 30A, §14, of the decision of the State Building Code Appeals Board upholding Newton’s ruling requiring upgrading of the fire alarm system. For the reasons that will be explained, the Court concludes that, despite the lengthy history of the dispute, the record is insufficient to provide a basis for review in either respect, and accordingly will order remand to each of the administrative entities for further proceedings.
BACKGROUND
lodice is the owner of an apartment complex in Newton known as the Woodland Apartments. The complex, originally built in 1965, consists of a total of one hundred and twenty-six units. The units are located in a number[1] of buildings, each of which bears an address on Grove Street. Beginning in August of 1994, lodice undertook to perform certain renovations. On August 31, 1994, lodice applied to the Newton Inspectional Services Department for a building permit for work to be performed in the eleven-unit building known as 264 Grove Street. The permit application described the work as “remodel kitchens and baths,” and listed the total cost of the work at that address as $76,942. An attached schedule of costs broke that figure down into smaller amounts for plumbing, cabinets, windows, appliances, “entrance,” electric, and demolition. No drawings or plans for the work were provided. The Commissioner of Inspectional Services issued the permit on the same date.
Soon thereafter, however, by letter dated September 16, 1994, Joseph LaCroix, Assistant Chief of Operations of the City’s Fire Department, notified Inspectio-nal Services Commissioner Walter Adams that on July 11, 1994, the City had adopted G.L.c. 148, §261, as a result of which “all residential units containing four or more units must be sprinklered.” LaCroix’s letter set out the text of the cited statute, which requires that “any building hereafter constructed or hereafter substantially rehabilitated so as to constitute the equivalent of new construction and occupied . . . for residential purposes and containing not less than four dwelling units ... shall be equipped with an approved system of automatic sprinklers . . . LaCroix concluded *717 his letter with the request that ’’this above referenced property comply with this provision of the law before any occupancy is granted."
The work proceeded until February 1995, when Iodice requested a certificate of occupancy. The Fire Department then conducted an inspection on February 27, 1995, and issued to Iodice a notice that the building was in violation of fire laws, in that:
This building must comply with Massachusetts General Law, Chapter 148 Section 261 which was accepted by the City of Newton on July 11, 1994. Also the fire alarm system does not comply with 527 CMR.[2]
It should be noted that 780 CMR[3] was not followed by the owner’s representative for permit purposes.
The notice directed Iodice to correct the violations by April 14, 1995, and further notified him of a right to appeal to the State Fire Marshall within ten days. The City issued a “temporary 30 day” certificate of occupancy, dated February 27, 1995, with the notation that the certificate was “contingent upon conformance with 261 or an appeal to the State Fire Marshall & work to begin immediately in upgrading fire alarm system.”
Iodice responded by filing two administrative appeals, both dated March 7, 1995, one directed to the Automatic Sprinklers Appeals Board, regarding the requirement to install sprinklers, and one directed to the State Building Code Appeals Board (“SBCAB”), regarding the requirement to upgrade the fire alarm system. As the ground of his appeal to the Automatic Sprinklers Appeals Board, Iodice asserted that “(t]he work undertaken by the Appellant is not substantial rehabilitation, but rather consists of painting and replacing worn components with similar new components (e.g. kitchen cabinets and bathroom fixtures).” To the SBCAB, Iodice asserted that “(t]here are no substantial alterations being undertaken; rather, the work consists of reconditioning an existing building.”
Soon after Iodice’s filing, the Automatic Sprinkler Appeals Board determined that the State Fire Marshall was the proper official to consider an appeal from a determination under c. 148, §261, and referred the matter to that official. Thus, as of the early spring of 1985, Iodice had appeals pending before the Fire Marshall and the SBCAB, and had a temporary certificate of occupancy for 264 Grove Street. At that time Iodice also had pending applications for building permits for 290, 276, and 278 Grove Street, which he had submitted on January 20, 1995, and February 9, 1995.[4]
In April of 1995, while Iodice’s appeals were pending, Iodice and Newton officials agreed[5] that building permits would issue, and work would proceed, on the other buildings in the complex, and, upon completion of the appeals, Iodice would bring all the buildings into compliance with applicable requirements as determined by the appellate process. Under this arrangement, the City issued permits for 290, 276 and 278 Grove Street, and work proceeded, leading to the issuance of temporary certificates of occupancy, and Iodice’s filing of appeals to the State Fire Marshall from the City’s decisions as to each certificate of occupancy. The parties followed the same pattern as to 266 Grove Street, with a building permit issued on October 19, 1995, based on an application similar to those submitted for the other buildings in the complex.
In May of 1995, apparently after some discussion with the City resulting in concurrence on the point, Iodice came to the conclusion that the Fire Marshall’s determination “may be dispositive of the appeal presently pending before the [SBCAB].” Accordingly, his counsel requested the Fire Marshall to consider the fire alarm issue as well as the sprinkler issue, and requested of the SBCAB “that this appeal be continued generally until we seek and obtain a ruling on the issue from the State Fire Marshall’s Office.” The SBCAB refused that request, and Iodice then withdrew his appeal to the SBCAB “without prejudice.”
In January of 1996, the State Fire Marshall notified Iodice that “[y]our appeals . . . are hereby dismissed for lack of jurisdiction,” on the ground that “a direct and immediate fire or explosion hazard must be shown for the State Fire Marshall’s jurisdiction to be invoked.” Iodice did not seek judicial review of that determination. Thus, as of that time, Iodice’s appeals from the City’s determinations had all concluded, without any substantive ruling by any of the state entities in which he had sought review. Meanwhile, work had been completed in five buildings, and those five were occupied under temporary certificates of occupancy, each issued for a specified period that had long since expired, and each by its terms requiring installation of sprinklers and upgrading of the fire alarm system. Nevertheless, in March of 1996, Iodice submitted similar permit applications for 268, 280, and 282 Grove Street.
In the context of these new applications, relations between Iodice and Newton officials deteriorated, as reflected in a series of correspondence between Iodice and his counsel and Commissioner Adams. The City took the position that, Iodice’s appeals having concluded without overruling the fire department’s determinations, he was obligated to comply with those determinations by installing sprinklers and upgrading alarm systems in each of the buildings then occupied under the temporary certificates of occupancy, and to include provision for those features in his applications for the remaining buildings in the complex. Iodice relied on the fact that he had yet to receive any substantive administrative review, and persisted in his position that the renovations were merely cosmetic and did not trigger those requirements.
Among the topics addressed in correspondence between the parties during this period was a memo *718 randum Issued by the Newton Fire Department, expressing its interpretation of G.L.c. 148, §§26G and I.[6] As described by Assistant Chief LaCroix to the SBCAB, this document was merely a “first draft” of “a set of guidelines that we would use for interpretation ... so that our departments could handle these cases as they come up, in the same manner.” The memorandum indicated that the Fire Department would consider the “substantially rehabilitated” test of §261 to be met if either “(t]he amount of work being performed amounts to more than fifty percent (50%) of the one hundred percent (100%) equalized assessed value of the building” or “the cost of fully sprinklering does not exceed ten percent (10%) of the cost of construction.”
On August 9, 1996, Iodice resubmitted permit applications for 280 and 282 Grove Street. These addresses refer to what the parties have variously described as either two eleven-unit buildings, joined by a common wall, or one twenly-two unit building. The significance of the distinction lies in 527 C.M.R. 24.07(3)(c), which requires a “Type I” fire alarm system in buildings of 13 or more dwelling units. A Type I system, unlike a Type II system, includes “automatic fire department notification.”
Iodice’s permit application forms for 280-82 Grove Street provide no description of the work, but do include cost estimates in total amounts identical to those contained in the earlier applications. Plans submitted with these applications, dating from 1981, show the building layout and location of fixtures, including components of the fire alarm systems, but do not indicate the work proposed, and do not bear an architect’s seal.
Commissioner Adams referred the applications to the Fire Department. In a memorandum dated August 16, 1996, Assistant Chief LaCroix informed Commissioner Adams that “a number of problems must be addressed.” He detailed the “problems” as follows:
1) This structure is applicable and must comply with Massachusetts General laws Chapter 148, Section 261.
2) This structure is considered a 22 Unit Apartment Structure by the Newton Fire Department.
3) All necessary submittals, as are required by code and regulations, have not been presented with the application for permit.
4) The plans do not meet 780 Code of Massachusetts Regulations Article I and 10 requirements.
5) Official Interpretation #45-95 from the State Board of Building Regulations and Standards requires that sprinkler plans are submitted at time of permit.[7]
By letter dated September 10, 1996, Commissioner Adams notified Iodice that the permit applications for 280-82 Grove Street “have been refused.” He set forth three grounds, as follows:
1. The permit application does not include a general description of the proposed work and plans submitted are inadequate because they do not indicate any of the construction work to be performed. All such plans for buildings in access (sic) of 35,000 cubic feet must bear the seal of a qualified professional architect. (780 CMR 113.4, 113.5, 113.5.2, 1001.)
2. As indicated in my August 22, 1996 letter to Mr. Moruzzi, the permit applications have been disapproved by the Newton Fire Department for failure to comply with the requirements of MGL c. 148, s. 26-1 and for other reasons listed in their August 16, 1996 memorandum. (780 CMR 113.5, 1000, 3203.11.)
3. It would appear that the wall separating the two, eleven unit sections of this building does not meet the firewall construction requirements of the Code. Therefore this building must be considered as one, twenty-two unit building in determining compliance with the Code. (780 CMR 908.)
Iodice responded to this determination by resubmitting the application, this time with plans bearing an architect’s seal. These plans included a list of work to be done, and noted the location of certain aspects of the work, along with specification of certain materials.[8] Commissioner Adams again referred the matter to Assistant Fire Chief LaCroix, under a cover memorandum dated October 10, 1996, expressing his apparent satisfaction with the level of information provided by these latest plans. LaCroix responded, by memorandum dated October 16, 1996, setting forth the same objections as his August 16 memorandum.
Iodice’s next step was another appeal to the SBCAB.[9] Unlike his earlier efforts at administrative review, this appeal resulted in two hearings before that Board, one on December 12, 1996, and the second on April 8, 1997. At the first hearing, Iodice’s counsel appeared, along with architect John W. French. For the City of Newton, counsel appeared along with Assistant Fire Chief LaCroix and Commissioner Adams.
At the outset, the Board heard argument from Iodice’s counsel on the issue of what constitutes “substantially rehabilitated” within the meaning of §261. Counsel asserted that the renovation work at the apartment complex did not include opening walls and ceilings. He then addressed the alternative tests appearing in the Fire Department’s memorandum.[10] He argued that renovation cost as compared to assessed value is not an appropriate measure, since assessment reflects location, rather than building costs; as an alternative test, he proposed comparison of renovation cost with replacement cost, and made reference to “an excerpt from the Means Handbook which is annexed to my Memorandum” as a source of information on replacement cost. Based on that source, counsel argued that “the work doesn't even approximate 10% of the replacement cost.” On the issue of the cost of installing sprinklers as a proportion of the cost of *719 the renovation, counsel presented the opinion of architect French that installation of sprinklers would cost “approximately $19,000 or $20,000" per eleven unit building, not including "repairs to some of the invasive things that you do to the building while you’re installing."
Based on that estimate, counsel argued that installation of sprinklers would cost “roughly 20% of the cost of the renovations,” twice the maximum stated in the Fire Department’s interpretive memorandum. This was apparently the first time Iodice had offered any estimate of the cost of installing sprinklers; nothing in the record suggests that Iodice had ever provided either the Fire Department or Commissioner Adams with any such estimate. Nor does the record contain any estimate made by or on behalf of the City, or any other evidence of the cost of installing sprinklers in the buildings in issue.
In response, Commissioner Adams described the work occurring at the Woodland Apartments, apparently based on observations upon inspection,[11] as involving “renovations throughout a complex ... removing the fire alarm system . . . gutting out the kitchen and the bathrooms . . . installing all new window systems, . . . installing all new fire rated door systems in all the units . . . new alarm systems, . . . new carpeting, paint and paper . . . new awnings, exterior awnings on the front and rear entrances He expressed skepticism as to the cost estimates provided for the work, offering no evidence to contradict those estimates, but asserting that “I sure couldn’t do it for that kind of price.” Assistant Chief LaCroix described his observations upon inspecting the work performed at 264 Grove Street in February of 1995, as follows:
the fire alarm systems were compromised, I mean they replaced everything according to the (inaudible) we replaced every detector in there and panels were replaced ... It was at that time when we realized how much work was going on — and you’re talking in the neighborhood of close to $100,000 at buildings that were assessed at $209,000 so you are talking almost close to 50%.
The Board’s Chairman then inquired of counsel for Iodice as to whether he was “debating” the officials’ descriptions of the “scope of the work.” Counsel responded that, with respect to the fire alarm system, the work had involved only replacement of “certain worn out smoke detectors and other pieces of equipment,” and that the other work had involved replacement of windows and doors, rather than “systems." Upon further inquiry to LaCroix as to how he determined substantiality, LaCroix first referred to the cost of the work as shown on the applications, and then stated that “in my looking at it you could see the scope of the work and the performance of the systems missing.”
After hearing these arguments, the Board Chairman made a motion that the Board rule “that the Building Official did properly accept and transmit this to the local fire chief in this particular instance. There was enough evidence that there would be or could be substantial rehabilitation and that the local fire chief has to make that determination .. . Once it goes to the local fire chief then it is out of our jurisdiction and there is proper means, I hope to appeal his decision.” The Board voted unanimously in favor of the motion, noting that Iodice had the right to appeal to the Fire Marshall from the Fire Department’s determination.[12]
The hearing then turned to the issue of the fire alarm system. Counsel for both sides presented that issue to the Board as dependent on whether 280-82 Grove Street was to be considered one building or two — that is, whether the wall between those addresses met the requirements of the building code for a “fire wall.” The Board expressed a need for written submissions on that issue, and continued the remainder of the hearing to allow for such submissions.
Iodice did not seek relief from the Fire Marshall on the sprinkler issue. Instead, he filed this action on February 28, 1997, seeking a declaratory judgment to resolve numerous alleged actual controversies between the parties, and in practical effect to permit him to perform the renovation work in all buildings of the complex without a building permit and without installing sprinklers or upgrading the fire alarm system. Newton responded by admitting the existence of an actual controversy, but asserting that Iodice had failed to exhaust his administrative remedies, and had failed to name the SBCAB as a necessary party.
Meanwhile, on April 8, 1997, the SBCAB resumed its hearing on the issue of upgrading of the fire alarm system. Present, in addition to counsel for both sides, were two representatives of Newton’s Inspectional Services Department, along with architect Linda Nesham-kln for Iodice. Counsel for Iodice began by arguing that the buildings in the complex were not being “substantially altered” within the meaning of c. 148, §26B, so as to trigger the requirement of compliance with the current building code, but that the “type II” fire alarm system at 280-82 Grove Street nevertheless does comply with the code, since that location is two eleven unit buildings, joined by a fire wall, rather than a single twenty-two unit building. Discussion followed as to the adequacy of the claimed “fire wall.” In that connection, the City presented the original 1965 permit application, which described the proposed construction as a single 22 unit building. Based on that information, members of the Board expressed the conclusion that the site is a single building, and turned to the issue of whether the work involved its being substantially altered. In that regard, Newton’s counsel asserted, apparently based on LaCroix’s statements at the previous hearing, that “(t]hey removed and replaced the panel for the whole building . . . they *720 took out the old panel for the fire detection system and replaced it . . . They did not get a permit for it . . .” Iodice’s counsel responded that “[t)he electrical wasn’t upgraded, the plumbing wasn’t upgraded it was just ... it went as far as the fixtures. They removed the old fixtures and put in new fixtures ...” An unidentified Board member then expressed the view that “the drawings are showing that you are working both outside the units, in the units and in the common areas. Once you start performing that work in the common areas and in the units you have to comply with the new Code.” Asked by Iodice’s counsel for clarification, the Board member responded that “[y]ou replaced the panels . . . you are replacing a ton of smoke detectors here.” Finally, Newton presented testimony of its In-spectional Services Department representatives, who had inspected the claimed fire wall since the previous hearing, to the effect that the wall does not protrude above the roof sufficiently to meet current building code requirements for a fire wall. The hearing concluded with the Board’s vote to take the matter under advisement.
For the next thirteen months, the parties awaited a decision from the SBCAB. In the interim, Newton moved to dismiss this action for failure to exhaust administrative remedies and to join the SBCAB. Iodice responded that the previous rulings of the various state agencies rendered exhaustion futile, and that the • SBCAB’s failure to issue a decision made it unnecessary as a party. The motion to dismiss was denied on March 12, 1998 (Borenstein, J.). The case was set for trial, but not reached.
On May 6, 1998, the SBCAB issued a written decision denying Iodice relief. The Board ruled:
1. That in accordance with the Board of Building Regulations and Standards Official Interpretation Number 45-96, the building official was correct in forwarding the plans to the head of the fire department for determination as to whether MGL c. 148 Section 261 is applicable given the scope of work contemplated.
2. The State Building Code Appeals Board lacks the jurisdictional authority adjudicate appeals relative to determinations made under MGL c. 148, Section 261 by the head of the local fire department.
3. The existing masonry wall separating the two groups of eleven dwelling units did not, at the time of construction, meet the minimum requirements to be classified as a fire wall and the same is true today under the current State Building Code. The wall is more appropriately classified as a fire separation assembly. There the 22 units are contained in a single building and not two separate eleven unit buildings.
4. The extent of work to the existing fire alarm system (replacement of detectors and replacement of the fire alarm control panel) is extensive and constitutes a new system under Section 3203.3 and as such requires that the system be installed in accordance with the building code for new construction.[13]
Iodice then amended his complaint to name the SBCAB, seeking review of its decision pursuant to G.L.c. 30A, §14. Thereafter, in a status conference before the Court, counsel agreed that in the absence of review before a state agency, the certioriari statute, G.L.c. 249, §4, provides the proper means of review of the City’s determination on the sprinkler issue under G.L.c. 148, §261, with review to be limited to the record of the administrative proceedings, to be filed by the City. The City filed its administrative record on March 19, 1999, and on April 2, 1999, the SBCAB filed as its answer, pursuant to G.L.c. 30A, §14, an “Agreed Upon Supplemental Administrative Record.” Counsel submitted memoranda of law thereafter, and the Court heard oral argument on June 30, 1999. Iodice submitted an additional memorandum of law, with leave of Court, on August 2, 1999.
At this stage Iodice has abandoned a number of the contentions raised before the various administrative bodies and in his complaint, and has narrowed his theories as to the City’s errors. He no longer contests that the work requires building permits, and that a pre-condition for the issuance of such permits was his submission of permit applications, with plans, fully disclosing the work to be performed, and including provision for any legally required upgrading of fire protection systems. With respect to the sprinkler issue, Iodice no longer contests the propriety of Commissioner Adams’ referral to the fire department, or that department’s power to determine the application of G.L.c. 148, §261, nor does he renew his contention that the fire department exceeded its authority by expressing its interpretation of that statute in a memorandum. His present argument on the sprinkler issue is that the fire department failed to apply the statutory standard of “substantially rehabilitated so as to constitute the equivalent of new construction,” and that the facts do not meet that standard.
As to the fire alarm issue, Iodice now concedes that the purported “fire wall” does not meet building code requirements, so that 280-82 Grove Street is properly treated as a single twenty-two unit building, requiring a “type II” fire detection system if the current building code governs. His present argument is that he is not required to upgrade to meet the standards of the current building code, because neither of the potential triggers for that requirement applies. He contends that the SBCAB failed to apply the “substantially altered” standard under G.L.c. 148, §26B, and that the facts do not rise to that level. He further contends that the work does not involve replacement of any fire detection “system,” so as to trigger a requirement of upgrading on that ground under the building code, but that the work on the fire alarm system involves only replacement of individual components.
*721 DISCUSSION
The standards of judicial review of both local and state administrative decisions are well established. Under G.L.c. 249, §4, the function of judicial review is to correct errors of law apparent on the record, which adversely effect material rights. MacHenry v. Civil Service Com’n, 40 Mass.App.Ct. 632, 634 (1996). Relief in the nature of certiorari is warranted where a plaintiff demonstrates errors that are “so substantial and material that, if allowed to stand, they will result in manifest injustice to a petitioner who is without any other available remedy.” Johnson Products, Inc. v. City Council of Medford, 353 Mass. 540, 541 n.2 (1968), quoting Tracht v. County Commrs. of Worcester, 318 Mass. 681, 686 (1945). In a certiorari case, the court is not authorized to weigh evidence, find facts, exercise discretion, or substitute its judgment for that of the administrative body. Rather, the court’s role is limited to determining whether the decision is legally erroneous, or is so devoid of factual support as to be arbitrary and capricious. See FIC Homes of Blackstone, Inc. v. Conservation Commission of Blackstone, 41 Mass.App.Ct. 681, 684-85 (1996).
The applicable standard under G.L.c. 30A, §14 (7), is similar. Under that statute, a reviewing court may reverse, remand, or modify an agency decision if “the substantial rights of any party may have been prejudiced” because the agency decision is based on an error of law or on unlawful procedure, is arbitrary and capricious, or is unwarranted by facts found by the agency supported by substantial evidence. The party seeking review bears the burden of demonstrating the invalidity of the agency’s decision. Merisme v. Board of Appeal on Motor Vehicle Liab. Policies and Bonds, 27 Mass.App.Ct. 470, 474 (1989). The Court is required to “give due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it” by statute. G.L. 30A, §14(7) (1997); Flint v. Commissioner of Pub. Welfare, 412 Mass. 416, 420 (1992); Seagram Distillers Co. v. Alcoholic Beverages Control Comm’n, 401 Mass. 713, 721 (1988). The reviewing court may not substitute its judgment for that of the agency. Southern Worcester County Regional Vocational Sch. v. Labor Relations Comm’n, 386 Mass. 414, 420-21 (1982), citing Olde Towne Liquor Store, Inc. v. Alcoholic Beverages Control Comm’n, 372 Mass. 152, 154 (1977). Nor may a court reject an administrative agency’s choice between two conflicting views, even though the court justifiably would have made a different choice had the matter been presented de novo. Zoning Bd. of Appeals v. Housing Appeals Comm’n, 385 Mass. 651, 657 (1982) (citations omitted).
The common theme in both types of judicial review of administrative action, of most significance here, is that the court does not find facts. Rather, it is the responsibility of the administrative body to find the facts, based on the evidence before it, evaluating the credibility and the weight of that evidence through the lens of its own technical expertise. Once the facts are determined, the administrative body must apply the governing statutory or regulatory standard to those facts, exercising such discretion as the legislature has conferred upon it.
If the administrative body has failed to meet its basic responsibility to find the facts, the reviewing court cannot fill the gap, having no power to receive evidence or to judge its credibility or weight. Thus, except where the record discloses the absence of any material factual dispute, or where uncontested evidence establishes facts that compel a particular outcome, the administrative body’s failure to determine necessary facts generally requires remand to that body for performance of that essential function.
On review, the court may look behind the facts found by the administrative body only to determine whether the record provides adequate support for them. If it does, the court is bound by the facts as found, and its review is limited to issues of law, including determining whether the decision maker has acted arbitrarily and capriciously or has abused discretion. The court construes the law de novo, but where a statutory standard leaves room for interpretation, the court gives deference to the reasonable interpretation adopted by the administrative official to whom the legislature has entrusted enforcement authority.
I. The Sprinkler Issue.
The Newton Fire Department’s determination that Iodice is required to install automatic sprinklers in the Woodland Apartments rests on application of G.L.c. 148, §261. That statute requires, in municipalities that have adopted it,[14] that sprinklers be installed in “any building hereafter constructed or hereafter substantially rehabilitated so as to constitute the equivalent of new construction and occupied in whole or in part for residential purposes and containing not less than four dwelling units ...” The question, then, is whether the fire department properly determined that the work performed at the Woodland Apartments, and particularly the work proposed for 280-82 Grove Street, was so extensive that buildings were being “substantially rehabilitated so as to constitute the equivalent of new construction.”
The statutory standard is not self-explanatory, as this dispute reflects. The parties have cited no case law under §261, and the Court has found none. Nor does it appear that any responsible state official or body, such as the State Fire Marshall, has issued any interpretation.[15] Absent any definitive statewide interpretation, that of the Newton fire department warrants deference if it reasonably reflects the apparent intent and purpose of the statute. Unfortunately, however, in announcing his decision in this matter in his memoranda of August 16 and October 16, 1999, Assistant Chief LaCroix did not express or rely on any *722 identified interpretation of the statutory standard. Indeed he did not even recite the statutory standard, but merely asserted that “this structure is applicable and must comply with” the statute. From his written decision, it is impossible to tell on what basis he reached that conclusion.
Assistant Chief LaCroix’s comments before the SBCAB, provide some hints as to his reasoning, but no clear articulation. He noted the cost of the work being performed as compared with the assessed value of the buildings, and asserted his own observations as to the scope of work performed, noting particularly replacement of parts of the fire alarm system. He did not, however, expressly adopt any particular test as the basis for his decision, nor did he provide detail as to his own observations, except to say that “every detector in there and panels were replaced.” Without any definitive statement of the test applied by the fire department, the Court can determine neither whether that test is a reasonable interpretation of the statute, nor whether its application is supported by facts in the record.
The fire department’s May 1996 interpretive memorandum does provide a general interpretation of the statutory standard, based on two alternative tests: whether the cost of the work exceeds fifty percent of assessed value, and whether the cost of installing sprinklers is not more than ten percent of the cost of the work. These tests are apparently drawn from Congregation Beth Sholom & Community Center, Inc. v. Building Commissioner of Framingham, 27 Mass.App.Ct. 276 (1989). There the Appeals Court applied the “major alterations” standard established by St. 1986, c. 284, §2, to determine whether renovation of a large non-residential building would trigger the requirement of installing sprinklers under c. 148, §26G. Although the statutory language is not identical, the Court’s reasoning in that case is equally applicable to §261, so that its interpretation of the statutory standard in issue there provides considerable assistance in construing this statute.
The Court there observed:
The automatic sprinkler requirement ... is a fire safely measure. The legislature obviously intended ... to give some protection to owners of older buildings against the large expense of installing sprinklers. Fire safety concerns would predominate, however, when, because of certain changes to an older building, imposition of the sprinkler requirement would be reasonable. This could occur . . . when such significant work is being done to it that the extra cost of installing sprinklers would be moderate in comparison to the total cost of the work contemplated. It would also occur when the physical work being done is of such scope that the additional effort required to install sprinklers would be substantially less than it would have been if the building were intact. In the context of the statute, therefore, “major alterations” would include any work, not repairs, which is “major” in scope or expenditure, and which results in changes affecting a substantial portion of the building.
Id. at 279. Applying this reasoning to the facts before it, the Court noted that the work involved “installation of new hung ceilings, floors and walls, renovation of a kitchen, relocation of air conditioning ducts and a stairway, and an extension of the first floor,” that it cost $550,000, and that installation of sprinklers during the work would cost $60,000. Based on these facts, and in light of the importance of sprinklers “from the viewpoint of fire safety,” the Court concluded that the municipal defendant had reasonably applied the statute to require installation of sprinklers. Id. at 277-78.
The Appeals Court’s decision in that case supports the overall approach adopted in the Newton Fire Department’s memorandum, although not the particular ratios set forth there. The Court looks to the cost of the project as a general test of the “scope of the work,” although it does not make any express comparison with any particular measure of value. It notes the particular nature of the work, in reference to whether “the additional effort required to install sprinklers would be substantially less than it would have been if the building were intact.” Most particularly, it compares the cost of installing sprinklers with the cost of the renovation project, ruling a ratio of approximately eleven percent, in combination with the other factors, a reasonable basis for application of the statute.
The Court’s analysis in Congregation Beth Sholom & Community Center, Inc. v. Building Commissioner of Framingham identifies the factors to be considered: the cost of the project, the nature of the particular work involved, particularly as it may facilitate installation of sprinklers, and the relative cost of the installation of sprinklers. The record in this case indicates that the Newton Fire Department considered the cost of the project and the nature of the work, but does not reveal how it evaluated those factors. The record reflects no consideration of the cost of installing sprinklers, since it appears that Iodice never provided the City with any such estimate prior to its decision.
Perhaps more importantly from the point of view of judicial review, the record leaves considerable doubt as to the facts on which the City based its determination. As to the cost of the work, the City officials referred at the SBCAB hearing to the cost estimates stated in the permit applications, and offered no contrary evidence, but nevertheless expressed considerable skepticism regarding the validity of those estimates. It may fairly be assumed that the City’s building officials have sufficient expertise in such matters that they could reasonably reject a cost estimate provided to them as unrealistic. In this case, however, it is simply unclear whether they accepted or rejected Iodice’s cost estimates, and if they rejected *723 them, what they found to be the realistic cost of the work. The record is similarly unclear on the total value to which the cost of the work is to be compared. The participants at the SBCAB hearing cited various figures as assessed value, and the memoranda submitted to the Court also provide various figures, but the record includes no documents from the office of the City assessor, and no explicit finding by the fire department that any particular figure represents the assessed value of any particular building at any specified time.[16]
The record is equally, if not more, inadequate as to the actual physical nature of the work. Although Iodice’s counsel asserted before the SBCAB that no walls or ceilings were being opened, Commissioner Adams referred to “gutting” of kitchens and bathrooms. Assistant Chief LaCroix emphasized before the SBCAB that his conclusion was based on his personal observation of the work done, but give little description of what he actually saw, beyond the replacement of “panels.” Whether, and to what extent, the work, involves opening of walls or ceilings, is obviously of substantial relevance to the question of whether “the additional effort required to install sprinklers would be substantially less than it would have been if the building were intact.” Congregation Beth Sholom & Community Center, Inc. v. Building Commissioner of Framingham, 27 Mass.App.Ct. at 279. This, again, is a factual question that must be resolved by the fire department.
Because of these inadequacies in the record, the Court is unable to review the fire department’s determination under §261, and must order the matter remanded to that department. On remand, the fire department should clearly determine and identify the particular facts on which it bases its decision, and should provide an explanation of the test it applies to those facts, based on its interpretation of the statutory standard. The fire department is free to apply the alternative tests stated in its interpretive memorandum, both of which are consistent with Congregation Beth Sholom & Community Center, Inc. v. Building Commissioner of Framingham, 27 Mass.App.Ct. 276. The fire department is not, however, bound by the particular numerical ratios of the work. Although Iodice’s counsel asserted before the SBCAB that no walls or ceilings were being opened, Commissioner Adams referred to “gutting” of kitchens and bathrooms. Assistant Chief LaCroix emphasized before the SBCAB that his conclusion was based on his personal observation of the work done, but gave little description of what he actually saw, beyond the replacement of “panels.” Whether, and to what extent, the work involves opening of walls or ceilings, is obviously of substantial relevance to the question of whether “the additional effort required to install sprinklers would be substantially less than it would have been if the building were intact.” Congregation Beth Sholom & Community Center, Inc. v. Building Commissioner of Framingham, 27 Mass.App.Ct. at 279. This, again, is a factual question that must be resolved by the fire department.
Because of these inadequacies in the record, the Court is unable to review the fire department’s determination under §261, and must order the matter remanded to that department. On remand, the fire department should clearly determine and identify the particular facts on which it bases its decision, and should provide an explanation of the test it applies to those facts, based on its interpretation of the statutory standard. The fire department is free to apply the alternative tests stated in its interpretive memorandum, both of which are consistent with Congregation Beth Sholom & Community Center, Inc. v. Building Commissioner of Framingham, 27 Mass.App.Ct. 276. The fire department is not, however, bound by the particular numerical ratios set forth in its memorandum, since no binding authority dictates those ratios. Rather, the department should determine and consider all the relevant facts, in light of its expertise, and should exercise its discretion to apply the statutory standard in a manner that will reasonably serve the dual legislative purposes of promoting fire safely while avoiding the imposition of disproportionate costs on owners of existing buildings. Once the fire department issues a decision on remand, Iodice will have a right of appeal to the State Fire Marshall if he continues to be aggrieved. It now appears clear that the Fire Marshall will accept jurisdiction,[17] so that the effort will not be futile, and that office’s determination will provide a statewide standard for interpretation of the statute, informed by the technical expertise of the official to whom the legislature has entrusted statewide responsibility in this area.
II. The Fire Alarm Issue.
As the parties all recognize, the law does not generally require the owner of an existing building to upgrade its fire alarm system to current standards, in the absence of some voluntary action by the owner to trigger that requirement. The record of this matter identifies two possible triggers: G.L.c. 148, §26B, which makes current building code requirements applicable to a building that is “substantially altered,” and 780 C.M.R. §3203.3, which requires that any new “building system or portion thereof’ conform to the current building code.[18] Despite lengthy discussion at its hearings regarding the overall scope of the work done at the buildings, the SBCAB made no determination in its written decision as to whether the work meets the “substantially altered” standard. Rather, it relied solely on the work being done to the fire alarm system, ruling that that work “constitutes a new system under Section 3203.3. . . .” Accordingly, the Court’s review must begin with the ruling of the SBCAB under that regulatory provision.
Section 3201.1 of the building code, 780 C.M.R., defines “Building System” as including any “fire protection system, or fire resistive construction system, or portion thereof.” On its face, this definition includes not only a fire alarm system, but also every part of such a system, including every smoke detector. As noted supra, however, §3203.3 authorizes repair or *724 replacement of “individual components of an existing building system . . . without requiring that system to comply fully with the code for new construction."[19] The question then, for purposes of §3203.3, is whether the work Iodice proposes to do at 280-82 Grove Street, and did in the other buildings in the complex, involves merely replacement of individual components, or installation of a new “system.”
The work that the SBCAB found to constitute installation of a new system, according to paragraph 4 of its decision, is “replacement of detectors and replacement of the ñre alarm control panel.” The plans submitted for 280-82 Grove Street show replacement of all or nearly all smoke detectors, but no replacement of anything identified as a “panel.” The Board’s finding in this regard is apparently based on Assistant Chief LaCroix’s description of his observation, upon inspection of another buildingin the complex, that a “panel” was replaced. LaCroix’s statement, and the response to it from Iodice’s counsel, leaves some uncertainty as to whether this element is included in the work contemplated for 280-82 Grove Street, or was unique to the particular building inspected. It is similarly unclear whether the Board found replacement of only one panel, or of panels throughout the complex. Iodice argues that smoke detectors and panels are merely components of the fire alarm system, so that their replacement does not constitute installation of a new system. He points out that a contrary ruling would tend to create a disincentive for owners to replace worn components, with consequent impairment of public safety.
The argument has considerable force, at least as to smoke detectors; these are a device familiar to lay persons, so that no particular expertise seems necessary to categorize them as components of a system, rather than a system in themselves. As a matter of common sense, however, it would seem that any system is made up of components, so that replacement of increasing numbers of components becomes replacement of the system itself at some point along a continuum. Whether replacement of panels, along with smoke detectors, brings the process to that point on the continuum is simply unclear on this record. The question may depend on what else, if anything, is involved in the particular system, in addition to panels and smoke detectors. The record provides no answer to that question, and no explanation of the particular significance the Board attributed to the replacement of panels, in addition to smoke detectors. The Court is conscious of the expert function of the Board in construing and applying the building code to particular facts, and of the deference due the Board on review pursuant to G.L.c. 30A. Without further explanation from the Board, however, it is impossible to determine whether the Board’s ruling reflects application of its expertise in the exercise of its legitimate discretion, or whether it reflects instead a misinterpretation of the rules of law applicable to the issue before it. Accordingly, remand is necessary to the SBCAB, for clarification of its findings and rulings under 780 C.M.R. 3203.3.
On remand, the SBCAB should also decide whether the buildings are being “substantially altered” within the meaning of c. 148, §26G, so as to trigger a requirement of upgrading under that statute. This standard is closely related to the “substantially rehabilitated” standard under §261, and its application will depend on many of the facts that the fire department will determine for purposes of applying that standard. Additional facts that must be determined for purposes of this issue are the cost of upgrading the alarm system, to be compared with the overall cost of the project, and whether the work proposed involves disruption of whatever elements of the buildings would be involved in installing the upgraded system. Once the Board has determined these facts, with the benefit of the findings of the fire department, it will be in a position to apply the same principles of law discussed supra with respect to §261, based on the teaching of Congregation Beth Sholom & Community Center, Inc. v. Building Commissioner of Framingham, 27 Mass.App.Ct. 276. Review will then be available under G.L.c. 30A to any party aggrieved, on a record sufficient to permit the Court to perform the limited function assigned to it under that statute.
CONCLUSION AND ORDER
For the reasons stated, it is hereby ORDERED that this matter be REMANDED to the City of Newton and to the State Building Code Appeals Board for further proceedings, as described herein.

 The number of buildings is either eleven or six, depending on whether certain parts of the complex are characterized as separate buildings sharing common walls, or as wings of single buildings.

 527 C.M.R. §24.07(3) specifies requirements for fire warning systems in apartment buildings in various categories, depending on the number of units in the building. Under G.L.c. 148, §26B, these requirements “apply to every building erected or substantially altered to be occupied for residential purposes."

 780 C.M.R. §113 specifies requirements for building permit applications, including the requirements, at §113.4, 113.5, and 113.5.2, respectively, that the application “shall contain a general description of the proposed work . . . and shall state whether or not fire extinguishing equipment, plumbing, water piping, gasfitting, heating or electrical work is involved” and “shall be accompanied by not less than three (3) copies of specifications and of plans drawn to scale, with sufficient clarity and detail dimensions to show the nature and character of the work to be performed” and, in the case of the buildings containing more than 35,000 square feet of enclosed space, “shall bear the Massachusetts seal of registration of a qualified registered professional engineer or architect.”

 The application for 290 Grove Street described the proposed work as “windows, kitchens, entrance, bath, wallpaper, plumb/elect./Cosmetic improvements," at a total cost of $99,569.31 for the eleven unit building. The application for 276 Grove Street gave a nearly identical description and cost estimate. No plans were submitted with either application.

 The memoranda presently before the Court present conflicting characterizations of the nature and scope of this agreement. The conflict is of no significance to the issues to be decided; it appears clear that the parties proceeded under their agreements for a period of time, and neither is now asserting any claim or defense based on the agreement.

 The record does not clearly indicate when the Department issued the memorandum. It bears no date, although a copy appearing in the “Agreed Upon Supplemental Administrative Record,” apparently submitted to the SBCAB as an exhibit to Iodice's Hearing Memorandum, bears a facsimile heading showing a date of May 16, 1996. Iodice’s original complaint in this action alleges that the memorandum was issued on that date.

 The document referred to is a June 27, 1996 memorandum from the State Board of Building Regulations and Standards (“BBRS”) to “All Building Officials” regarding “Impacts of MGL c. 148, §§26G, 26H, and 261.” The memorandum states as its purpose “to foster cooperation between building and fire officials in this particular area of law which has caused some confusion in the past.” The memorandum sets forth that Board’s view that enforcement authority under §261 is in the local fire chief, with the role of the building inspector to make an initial determination of whether a permit application “may trigger” application of the statute, and, if so, to refer the issue to the fire chief. If the fire chief determines that the statute applies, and the application does not provide for installation of sprinklers, the building inspector must deny the permit. The memorandum delineates avenues of administrative review, placing review authority of determinations under §261 in the State Fire Marshall — the same official who, some five months earlier, had rejected Iodice’s appeals for lack of jurisdiction.

 The list is as follows:
1. Work applies to app. apts.
2. Replace all exist’g bathroom fixtures w/new fixtures.
3. Replace all exist’g kit cabs & fixtures w/new fixtures.
4. Replace carpet & wallpaper in all halls.
5. Replace all kitchen floors w/new tile.
6. Refinishing exist’g hardwood floors.
7. Replace all apt. entry doors w/1 hr rated wood door & metal frames.
8. Upgrade elec. Service to 400 amp/11 unit bldg.
9. Other general work: A. Replace bath tile. B. Replace interior apt. Doors. C. Replace lighting as needed. D. Repainting throughout. Noted in various locations on the drawing are “Replace all windows w/bronze alum dbl. Glazed wind.’’; “new AC units, branch wiring to be determined on site”; replace existing AC unit"; “new bronze canopy & curtain wall entries at entries to replace exist’g; "all foyers to be redone with granite floors & walls." A symbol appears in each apartment unit and common hallway, defined in a legend as “replace exist'g smoke dectector.”

 It appears that Iodice filed his appeal on October 9, 1996, after Commissioner Adam’s September 10, 1996 denial of the permit applications, but the Board was provided with documents reflecting the resubmission of the applications, with revised plans, in October, along with the City’s renewed rejection.

 Iodice’s counsel devoted a substantial portion of his argument before the SBCAB to characterizing the Fire Department's interpretative memorandum as a regulation, and challenging its authority to issue regulations. Although he asserted that same position in his original complaint in this Court, his memoranda on the matters now before this Court do not renew that argument. At this stage, it appears to be undisputed between the parties that the Newton Fire Departmemt has no authority to issue regulations, and has not purported to do so, but that no legal constraint prevents it from expressing its interpretation of the statute in memorandum form, for its own future reference.

 The record leaves some uncertainty as to whether Adams' description was based on his own observations or on information conveyed to him by LaCroix or others who had performed inspection. It appears undisputed that inspection had been performed not on 280-82 Street, but on other buildings in the complex, and that the work planned for 280-82 Grove Street was at least substantially the same as had been done on the other buildings.

 In discussion among Board members and counsel, it was noted that the BBRS memo had resolved the previous uncertainty as to avenues of review, so that the Fire Marshall’s earlier rejection of jurisdiction was unlikely to be repeated.

 780 C.M.R. §320.3 provides:
Any new building system or portion thereof shall conform to this code for new construction to the fullest extent practical. However, individual components of an existing building system may be repaired or replaced without requiring that system to comply fully with the code for new construction.

 Although he appeared to do so in his initial filings with the various state agencies, Iodice does not now contest that Newton did adopt §261 prior to any of his building permit applications for work at the Woodland Apartments.

 As discussed supra, the confusion among the various state officials as to responsibility for appeals in this area was resolved by the BBRS in June of 1996, with the allocation of responsibility for §261 to the Fire Marshall. The record does not disclose, however, any decisions the Fire Marshall may have made on disputes under this statute, or any interpretation that official may have adopted, in the three years since that date. If the parties have any such information, they have not provided it to the Court.

 The parties’ memoranda in this Court present arguments as to allocation of assessed value among the buildings in the complex, and as between land and buildings. These are factual issues that must be resolved by the administrative decision maker, not by this Court. Iodice argues that replacement cost, rather than assessed value, should provide the measure, and offers a figure derived from a document identified as “The Means Handbook.” Nothing in the record indicates whether the Newton officials accept that document as an authoritative source for replacement cost, nor does the record establish the extent to which Newton’s assessment of buildings (as opposed to land) reflects a determination of replacement cost. These too are factual issues that must be resolved by the responsible municipal officials, not by a reviewing court.

 See notes 12 and 15, supra.

 In its memorandum in this Court, Newton argues that upgrading is required for the additional reason that Iodice violated 527 C.M.R. 1.04(8)(g), which requires a permit from the fire department for "Installation, modification, repair, or removal of any sprinkler system, water main, fire hydrant, fire alarm system, or any device used for fire protection.” Newton cites no authority for the proposition that violation of such a permit requirement has the consequence of triggering a requirement to upgrade the alarm system to current building code standards.

 The building code, 780 C.M.R. §202, defines “building component” as follows:
Any subsystem, subassembly, or other system designed for use in or as part of a structure having concealed elements such as electrical, mechanical, plumbing, and fire protection systems and other systems affecting health and safety.